IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 6, 2006 Session

## STATE OF TENNESSEE v. MARQUES LANIER BONDS, AKA "MARK"

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 7706     Joseph H. Walker, III, Judge**

---

**No. W2005-02267-CCA-R3-CD  - Filed September 15, 2006**

---

The defendant, Marques Lanier Bonds, AKA "Mark," was convicted by a Lauderdale County jury of attempted second-degree murder, reckless aggravated assault, aggravated assault, reckless endangerment, and reckless endangerment with a deadly weapon.  He was sentenced to an effective term of twelve years in the Tennessee Department of Correction.  On appeal, he challenges: (1) the trial court's denial of his motion in limine regarding testimony of his prior incarceration; (2) the sufficiency of the convicting evidence; (3) the trial court's acceptance of the jury's verdict; and (4) the sentence imposed by the trial court.  Following our review of the record and the parties' briefs, we modify the judgments of the trial court to reflect the merger of the defendant's aggravated assault conviction into his attempted second-degree murder conviction and his reckless endangerment conviction into his reckless aggravated assault conviction and affirm the trial court's judgments in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed as Modified**

J.C. McLin, J., delivered the opinion of the court, in which David H. Welles, J., joined.  Gary R. Wade, P.J., not participating.

Kari I. Weber and Julie K. Pillow, Assistant Public Defenders, Somerville, Tennessee, for the appellant, Marques Lanier Bonds, AKA "Mark."

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Tracey A. Brewer-Walker, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  BACKGROUND**

The defendant was indicted for two counts of attempted second-degree murder, two counts of aggravated assault, and one count of reckless endangerment with a deadly weapon arising out of a shooting at Keely's nightclub in Ripley, Tennessee. At trial, Bryan Oldham,[1] one of the victims, testified that on November 25, 2004, he went to Keely's nightclub for a Thanksgiving celebration with his family. Bryan stated that he drank some alcohol before heading to Keely's, but the alcohol did not impair his ability to drive his two-door Cutlass vehicle. Bryan stated that he did not take any drugs that night.

Bryan stated that the Keely's parking lot consisted of a large slab of concrete lined with lights. Bryan testified that as the club was closing down and he was headed outside, he saw his brother involved in an altercation. He said that he went to his brother and pulled him out of the crowd just before he noticed the defendant with a gun "coming up out of his [sweatshirt] pouch." Bryan stated that he ran and got in his car as soon as he heard shots fired. In the rear-view mirror, Bryan recalled seeing the defendant approach his car and shoot, hitting him in the shoulder twice. Bryan testified that he jumped out of his car and the defendant shot him in the leg causing him to fall. However, he managed to get up, run across the street, and get into a car with an acquaintance. According to Bryan, he recognized the defendant because he and the defendant had been previously incarcerated together for a three-month period.

Bryan testified that he sustained injuries from three gunshots and the windows in his car were shot out in the process. He pointed out that the bullet in his leg and one of the bullets in his shoulder were not able to be removed. Bryan recalled that the shooting took place between 2:30 and 3:00 a.m. He expressed that the reason he ran when the defendant pointed the gun at him was because he was scared and afraid of his "life being gone." Bryan said that the defendant was wearing a light colored "hoodie" and carrying a nine millimeter handgun.

Bryan testified that he did not see anyone else with a gun that night. He recalled that there had been some problems at the club earlier, but those problems were not related to the shooting. He said there was no doubt in his mind that it was the defendant who shot him. Bryan explained that he did not want to say anything to the police that night because he was scared the defendant "might want to finish his job." However, Bryan said that he later cooperated with the police.

On cross-examination, Bryan admitted that the period of incarceration he spent with the defendant had been two or three years earlier and there had been approximately forty people housed together. Regarding the night of the shooting, Bryan stated that he had a "beer and a half pint of gin" before driving to Keely's. Bryan again stated that the defendant was wearing a "hoodie" with the hood covering the back part of his head. He did not remember seeing anyone in a green SUV with twenty-two inch rims shooting a gun. Bryan admitted that he spoke to the owner of Keely's about a week after the incident and told the owner that the defendant was the one responsible for the shooting.

---

[1] At times we will differentiate between the two victims in this case, Bryan Oldham and Jamison Oldham, by referring to them by their first names only.

Bryan testified that he did not tell the police who the shooter was until a week or two after the incident and the defendant was not arrested right away. He further testified that he never gave a written statement to police or identified the defendant out of a line-up. Bryan stated that his brother did not know the defendant's name but had described the shooter to him and the description matched the defendant.

Jamison Oldham, the other victim, testified that he met members of his family in Ripley for Thanksgiving dinner and later went with two friends to Keely's. Jamison stated that he did not have problems with anybody while inside the club, but one of his companions, Bruce Biggs, got into an altercation outside. Jamison recalled that he was walking toward his car when a group of guys walked up and "tr[ied] to get at . . . Bruce Biggs." Jamison explained that the group of guys surrounded him and Biggs and started hitting them. Jamison remembered getting knocked to the ground and his brother, Bryan, grabbing him out of the crowd.

Jamison testified that as his brother was leading him out of the crowd, he turned around and saw a guy with a gun shoot into the air a couple of times and then shoot in his direction. Jamison said that he was shot in his middle finger and the bullet went straight through his forearm. Jamison stated that he ran when he saw the gun because he thought the guy was trying to kill him. Jamison testified that he looked right in the shooter's face and the defendant was the shooter.

On cross-examination, Jamison testified that Bryan did not attend the family dinner but instead met him at Keely's. Jamison admitted to having one beer at his house before heading to Keely's. Jamison recalled that a fight broke out inside the club and he heard that someone had pulled a gun out. He admitted that the defendant's name was not mentioned in regard to the fight and gun inside. Jamison said that his uncle, who drove a green SUV, was at Keely's but he did not talk to him. Jamison said he did not see his uncle fire a gun. Jamison remembered that the defendant was wearing a "hoodie" with the hood down. Jamison further testified that he had described the shooter to the police as a tall black male wearing a white or light gray "hoodie." He did not remember whether the police asked him to give a written statement, but he was asked if he would make a line-up identification, although one was never conducted. Jamison admitted that the first time he pointed the defendant out as the shooter was in general sessions court.

Ollie Roberson, a dispatcher for the Ripley Police Department, testified that she dispatched all on-duty officers to Keely's in response to a shooting around 3:00 a.m. on November 26, 2004.

Marcus Hammond testified that he was at Keely's the night of the shooting and witnessed a fight involving individuals from Brownsville. Hammond stated that he also saw a gray Cutlass in the parking lot with the windows shot out. Hammond remembered that the person who shot out the windows was wearing a gray hooded pullover with the hood pulled up. He explained that he heard gunshots, saw a person running, and saw the car windows bust; however, he did not actually see the gun.

After looking at the statement he had given to the police, Hammond elaborated that the individuals from Brownsville were fighting the individuals from Ripley. Hammond recalled that a couple of minutes passed between the fight and when the shooting started. Hammond said that when the shots broke out he ran because he was afraid he might get shot.

On cross-examination, Hammond stated that a "dude in the green truck was shooting too." Hammond also stated that he knew the defendant and he could not recall whether he saw the defendant at Keely's that night. Hammond testified that there were two or three little street lights around the parking lot. Hammond stated that he did not see the individual in the gray pullover's face or skin tone.

Officer Don Mullins of the Ripley Police Department testified that he responded to a shots-fired call at Keely's around 3:00 a.m. on November 26, 2004. Officer Mullins discovered a vehicle at the scene that had its windows busted out. Through his interviewing of witnesses, Officer Mullins discovered that one window had been busted out with a chair and the other had been shot out. Officer Mullins also discovered a lead bullet, a live round, and some casings at the scene. Officer Mullins stated that the witnesses told him that six to eight shots had been fired but did not tell him the name of the shooter. On cross-examination, Officer Mullins admitted that the complaint card filled in by the dispatcher had the names of three potential suspects, the defendant not being one of them. He explained that the complaint card was generated off the 911 call and had nothing to do with what he reported.

Agent Alex Brodhag, firearms examiner for the Tennessee Bureau of Investigation, testified that the cartridge casings found at the scene were from a nine-millimeter weapon. Agent Brodhag also testified that he examined a bullet fragment found in the car and one recovered from one of the victims. He explained that there were several markings on the fragments that matched, but he could not say with absolute certainty that they were fired from the same weapon, though they were both nine-millimeter in caliber.

Lieutenant Steve Sanders, criminal investigator for the Ripley Police Department, testified that he investigated the crime scene and talked to both victims. He stated that when he arrived at the scene and began his investigation, the parking lot was lit well enough for them to look for evidence. Lieutenant Sanders testified that Jamison Oldham described the shooter as a tall, slim, black male wearing a gray or light color hood and said he could identify him if he saw him again; whereas, Bryan Oldham was scared to talk to him at first but later admitted that it was the defendant who shot him. Lieutenant Sanders stated that the defendant was not arrested until some time after the shooting because Lieutenant Sanders had a tough time finding people who were willing to testify against the defendant. He also stated that he investigated the three names on the complaint card but developed no additional proof on those suspects. On cross-examination, Lieutenant Sanders stated that he did not remember Bryan Oldham telling him that night in the hospital that the defendant was the gunman, although he had testified to such at the preliminary hearing.

Shannon Morgan testified that he knew the defendant and did not remember seeing him at Keely's the night of the shooting. He also testified that he knew Jamison and Bryan Oldham and he did not remember seeing them either. Mr. Morgan stated that he saw a large crowd in the parking lot of the club as it was closing and someone running toward the crowd wearing a gray hooded sweatshirt with the hood over their face. Mr. Morgan heard a gunshot but did not actually see a gun.

Marquita Taylor testified that she was at Keely's that night and saw a man named Terrance Barnes with a gun inside the club. She stated that she saw the defendant in the club but he did not have a gun. On cross-examination, Ms. Taylor admitted that she and the defendant had a baby together, and she left the club around 1:15 a.m. so she was not present when the shooting occurred.

Camron Smith testified that he was at Keely's that night and did not see the defendant the entire time. Mr. Smith said that Terrance Barnes pulled a pistol on him inside the club. He also said that he saw the Oldham brothers but he did not know them personally. Mr. Smith recalled seeing a fight outside the club around closing time. One of his friends was involved in the fight. As the fight continued, Mr. Smith saw someone "with a gray hood on tied up tight around their face from the back" shooting at a car. He estimated that at least ten shots were fired. Mr. Smith said that it was not that dark outside because there was a light nearby. Mr. Smith stated that he knew the defendant and the defendant had a football shaped head. According to Mr. Smith, the gunman did not match the defendant's description.

Jessie Cotton testified that he was working the door at Keely's that night. Mr. Cotton stated that two men got into an argument and security had to escort them out of the club. Mr. Cotton said that the defendant came to the club often and he did not remember seeing him at the club that night. However, he stated that it was "very possible" the defendant was there and he just missed him. Mr. Cotton testified that he heard shots in the parking lot that sounded like they were coming from different places. He noted that the parking lot was well-lit.

Larry Brooks, another Keely's employee, testified that he was working as security that night and a Terrance Barnes was involved in a fight inside the club. Mr. Brooks recalled seeing the defendant at the club but he did not know if he was involved in the fight. Mr. Brooks remembered that the defendant's uncle made the defendant and his brother leave and go home. Mr. Brooks said that he saw the defendant walk toward his home, which was a short distance away from the club. Mr. Brooks recalled seeing a fight, then somebody started shooting. However, he did not see the gunman. He said that he heard about six shots fired, coming from two different directions. Mr. Brooks also noted that the parking lot was well-lit.

Earlstine Bonds, the defendant's grandmother, testified that the defendant was living with her when the shooting took place and he had arrived home around 1:30 or 2:00 in the morning. Ms. Bonds stated that she heard seven or eight shots from the club around 2:30 or 3:00 a.m. and called 911. Ms. Bonds said that she had never seen the defendant with a gun, and he made his living boxing. Ms. Bonds admitted that several weeks after the shooting she reported that a gun had been stolen from her.

Upon the conclusion of the proof, the jury found the defendant guilty of the attempted second-degree murder of Bryan Oldham, reckless aggravated assault of Jamison Oldham, aggravated assault of Bryan Oldham, reckless endangerment of Jamison Oldham, and reckless endangerment with a deadly weapon. The trial court sentenced the defendant to an effective term of twelve years in the Department of Correction.

## II. ANALYSIS

### A. Motion in Limine

The defendant first argues that the trial court erred by denying his motion to exclude testimony regarding his prior incarceration. Prior to trial, the defendant made a motion in limine to prevent victim Bryan Oldham from testifying that he was able to identify the defendant because they had been incarcerated together for a three month period approximately two years before the shooting.

The Tennessee Rules of Evidence provide that all "relevant evidence is admissible" unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id.* Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* at 401. However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.* at 403.

Evidence of a defendant's character offered for the purpose of proving that the defendant acted in conformity with that character is not admissible. *Id.* at 404(a). Additionally, evidence of other crimes, wrongs, or bad acts is not admissible to prove the character of a person to show action in conformity with that character. *Id.* at 404(b). Such evidence may be admissible, however, for "other purposes" if the following conditions are met:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

*Id.*

Our supreme court has noted that such "other purposes" includes demonstrating the identity of the defendant. *State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004). When a trial court substantially complies with the procedural requirements of the rule, its determination will not be overturned absent an abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. James*, 81 S.W.3d 751, 759 (Tenn. 2002). When attempting to exclude otherwise admissible and relevant evidence, the individual seeking exclusion bears a "significant burden of persuasion." *See James*, 81 S.W.3d at 757-58.

Here, the trial court conducted a jury-out hearing and determined that identity was a key issue in the case. The court commented that although Bryan Oldham would testify that he had seen the defendant at Keely's two or three times, "there's a significant difference between seeing someone at a club a few times and being incarcerated with them for months." The court found that any prejudicial effect resulting from the jury knowing the defendant had been incarcerated on a prior occasion was outweighed by the relevance of Bryan Oldham's testimony. The court disallowed any testimony relating to the crime of which the defendant was previously incarcerated.

As noted by the trial court, the identity of the defendant as the gunman was a key issue at trial, and in fact, on appeal, the defendant argues that there was not sufficient evidence proving his identity. Moreover, the trial court ensured that the jury was not made aware of the crime of which the defendant had been incarcerated. In sum, the trial court completely followed the demands of Rule 404(b), and we find no abuse of discretion in the trial court's decision to allow Bryan Oldham to testify as to how he was able to identify the defendant as the shooter.

## B. Sufficiency

The defendant next argues that the evidence was insufficient to sustain his convictions. Specifically, he asserts that the proof of his identity as the shooter was insufficient, and even if the identification evidence were sufficient, the state did not prove that he "engaged in conduct reasonably certain to cause . . . death" to sustain a conviction for attempted second-degree murder.

Our review begins by reiterating the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of

the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Initially, we note that with the exception of his attempted second-degree murder conviction, the defendant does not argue that the evidence was insufficient to prove the offenses for which he was convicted; but rather, the defendant maintains that the evidence was insufficient to establish his identity as a participant in the offenses for which he was convicted. However, the proof at trial was sufficient to establish the defendant's identity as the perpetrator of the offenses.

At trial, both Bryan and Jamison Oldham identified the defendant as the gunman. Bryan explained that he was able to recognize the defendant because they had been incarcerated together for three months and he had seen him at Keely's on a few other occasions. Jamison stated that he got a good look at the gunman's face, and he pointed the defendant out as the gunman. Identification of the defendant as the perpetrator of the offense is a question of fact for the jury. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). A victim's identification alone is sufficient to support a conviction. *Id.* The jury heard the testimony at trial and accredited Bryan and Jamison's identification of the defendant, as was its prerogative. Accordingly, the proof of identity was sufficient; therefore, the defendant is not entitled to relief.

The defendant also avers that the proof was insufficient to sustain his conviction for attempted second-degree murder. He claims that the state failed to show that he engaged in conduct reasonably certain to cause the death of Bryan Oldham.[2] Second-degree murder is defined as the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id.* § 39-11-106(a)(20). Criminal attempt requires that one act "with the kind of culpability otherwise required for the offense . . . [and] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." *Id.* § 39-12-101(a)(2). Whether a defendant "knowingly" attempted to kill the victim is a question of fact for the jury. *State v. Inlow*, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). Intent may be inferred by the trier of fact from the character of the offense, the nature of the act and from all the circumstances of the case in evidence. *Id.* at 105.

---

[2] While the defendant was indicted for the attempted second-degree murder of both Bryan and Jamison Oldham, because the jury found the defendant guilty of the lesser-included offense of reckless aggravated assault in regard to Jamison, we need only address the defendant's attempted second-degree murder contention in regard to Bryan Oldham.

At trial, Bryan Oldham testified that he saw the defendant approach his car, take aim at him, and shoot him two times in the shoulder. He further testified that he jumped out of his car and the defendant shot at him again, this time hitting him in the leg. This testimony was sufficient for the jury to infer that the defendant intended to kill Bryan Oldham and was only unsuccessful due to Bryan's escape into the crowd. Although Bryan's injuries turned out not to be fatal, the defendant's repeated shooting evidences an intent to kill sufficient to sustain his conviction for attempted second-degree murder. Accordingly, the defendant is not entitled to relief.

## C. Verdict

The defendant argues that the trial court erred in failing to require the state to make an election of offenses to preserve his right to a unanimous jury verdict. He also argues that the trial court erred in affirming the jury's verdict even though the jury did not specify the victim of the reckless endangerment with a deadly weapon offense. The state argues that the defendant waived the first issue for failing to raise it in a motion for trial,[3] or alternatively, that the state was not required to make an election. It appears that the state failed to address the defendant's second issue.

Regarding the election issue, we agree that the state was not required to make an election. The doctrine of election requires the state to elect the facts upon which it is relying when it has charged a defendant with one offense, but there is evidence the defendant committed multiple offenses against the victim. *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999). The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same offense and same set of facts. *State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001). When the evidence does not establish that multiple offenses were committed, the need for election never arises. *State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000).

The defendant asserts that the jury obviously separated the shooting incident that occurred when Bryan and Jamison Oldham were together from the shooting incident that involved Bryan Oldham inside the car. He bases this assumption on the fact the jury found him guilty of different offenses toward each victim. Thus, the defendant seemingly argues the state was required to choose which instance of shooting upon which it was relying in regard to the offenses against Bryan Oldham.

We note that a similar situation was addressed by a panel of this court in *State v. Pelayo*, 881 S.W.2d 7 (Tenn. Crim. App. 1994). In *Pelayo*, the defendant stabbed the victim, the victim fled, and the defendant pursued her and stabbed her again. The court concluded that the victim's attempted

---

[3] We note that this is not a clear case of waiver. In his motion for new trial, the defendant asserted that the trial court should have rejected the jury verdict on the basis of inconsistency. In his appellate brief, the defendant again asserted that the jury verdict was inconsistent and then proceeded to discuss election of offenses. While we fail to see how an allegation of "inconsistency" would indicate that one was referring to an election issue, we will nevertheless address the issue because the defendant did not clearly waive it. However, we urge defense counsel to be more specific in raising issues in motions for new trial and on appeal.

escape did not separate the assault into multiple crimes. *Id.* at 12-13; *see also State v. Eddie Howard Pittman*, No. W2000-01582-CCA-R3-CD, 2001 WL 1042161 (Tenn. Crim. App., at Jackson, Sept. 7, 2001), *perm. app. denied* (Tenn. Feb. 11, 2002) (actions constituted one offense where defendant pointed gun at victim, pulled trigger but had a misfire, chased victim and fired at him again).

In this case, the two victims were in the parking lot outside the club when they saw the defendant approach and pull out a gun. As they were running away, the defendant shot Jamison, and Bryan split off and ran to his car. The defendant pursued Bryan and shot him twice. Bryan left his car at which point the defendant shot him again. Similarly to *Pelayo*, the defendant's actions "coalesced into an unmistakable single act, though separated by a few seconds and feet." *Id.* at 13. There is no indication that the defendant formed a new intent when he pursued and shot at Bryan; instead, the entire attack was but one continuous event and did not require the state to make an election.

However, while this case does not present an election of offenses problem, it does raise double jeopardy concerns. The double jeopardy clause in the United States Constitution provides that no person "shall . . . be subject for the same offense to be twice put in jeopardy of life or limb. . . ." U.S. const. amend V. Similarly, the Tennessee constitution states that "no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. The constitutional right against double jeopardy protects against, *inter alia*, multiple punishments for the same offense. *State v. Denton*, 938 S.W.2d 373, 378-79 (Tenn. 1996). To determine whether a defendant has received multiple punishments for the same offense, our supreme court has said that the reviewing court should consider: (1) the statutory elements of the offenses; (2) the evidence used to prove the offenses; (3) whether there were multiple victims or discrete acts; and (4) the purposes of those respective statutes. *Id.* at 381.

First, we will address the defendant's convictions with regard to Bryan Oldham. Attempted second-degree murder is committed when the defendant knowingly acts with the intent to kill and believes his conduct will cause the death without further action. *Id.* § 39-12-101(a)(2). Aggravated assault is an assault committed intentionally or knowingly, which causes serious bodily injury to the victim or is committed with the use or display of a deadly weapon. *Id.* § 39-13-102(a)(1). Thus, attempted second-degree murder requires an intent to kill; aggravated assault does not. Aggravated assault requires an assault with a deadly weapon, or an assault which causes serious bodily injury; whereas, attempted second-degree murder requires neither. Therefore, the statutory elements of the two offenses are different.

However, the evidence used to prove both offenses was the same – the defendant's shooting of Bryan Oldham where each gunshot was but a part of the one continual assault. Moreover, the purpose of both statutes is to prevent physical harms to persons. Weighing each of these factors, we conclude that the defendant's convictions for attempted second-degree murder and aggravated assault are the same for double jeopardy purposes because they were part of one continuous act of conduct. Accordingly, we modify the judgments of conviction to reflect merger of the defendant's

conviction in Count 3, aggravated assault, into his conviction in Count 1, attempted second-degree murder.

Second, we will address the defendant's convictions with regard to Jamison Oldham. Reckless aggravated assault is an assault committed recklessly, which causes serious bodily injury to the victim or is committed with the use or display of a deadly weapon. *Id.* § 39-13-102(a)(2). Reckless endangerment occurs when one recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury. *Id.* § 39-13-103(a). While both statutes require a mental state of reckless, reckless aggravated assault requires the act to either cause serious bodily injury or be committed with the use or display of a deadly weapon; whereas, reckless endangerment only requires that the defendant's conduct place or potentially place another in danger of death or serious bodily injury. Thus, the statutory elements of the offenses are different.

However, once again, the evidence used to prove these offenses was the same – the defendant's shooting of and at Jamison Oldham. The defendant's attack on Jamison was one discrete act. Furthermore, the purpose of both statutes is to prevent physical harm to persons. Weighing each of these factors, we conclude that the defendant's convictions for reckless aggravated assault and reckless endangerment are the same for double jeopardy purposes. Accordingly, we modify the judgments of conviction to reflect merger of the defendant's conviction in Count 4, reckless endangerment, into his conviction in Count 2, reckless aggravated assault.

In addressing the defendant's second argument, regarding the jury's failure to specify the victim of the reckless endangerment with a deadly weapon, the defendant is not entitled to relief. We note that the defendant did not provide any citation to authorities in support of his argument. In fact, all the defendant said in regard to this issue was, "Further the jury did not find the defendant guilty of reckless endangerment with a deadly weapon as to any specific victim, and therefore the trial court should not have affirmed the verdict." As such, the defendant has waived this issue. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

Notwithstanding waiver, the defendant is not entitled to relief. Our supreme court in *State v. Payne*, 7 S.W.3d 25 (Tenn. 1999), determined that the offense of reckless endangerment could be committed against the public at large if the proof demonstrated that members of the public were in imminent danger of death or serious bodily injury due to the defendant's conduct. *Id.* at 28-29. In this case, the indictment charged reckless endangerment by placing "other persons" in imminent danger of death or serious bodily injury by shooting at Bryan and Jason Oldham as they ran into a crowd away from the shooter. The proof at trial demonstrated that the defendant's conduct placed a number of individuals in the zone of danger. Under these circumstances, we conclude the jury found that the victims of the reckless endangerment were representatives of the public at large. Accordingly, the defendant is not entitled to relief on this issue.

**D. Sentence**

The defendant lastly argues that the trial court improperly enhanced his sentence for attempted second-degree murder and improperly ordered consecutive sentencing. The state asserts that the sentenced imposed by the trial court was proper.

The state called no witnesses at the sentencing hearing, but instead relied on the pre-sentence report. At the hearing, the defendant's grandmother testified that the defendant had a daughter, had artistic abilities, was a boxer, and could make something of himself if given the chance. Diane Jarrett, a long-time friend of the defendant, testified that he was a "good young man" and the shooting incident was out of character for him. She stated that she believed the defendant was capable of rehabilitating himself and staying away from clubs.

The defendant, twenty-two years old at the time of sentencing, said that being incarcerated has had a big impact on him. He stated that he regretted all the events that led to his incarceration. He said that in the future he would quit going to clubs, take care of his daughter, pursue his boxing career, and develop his artistic skills.

The defendant stated that he had a conflict with Bryan Oldham before, but he had no plans for retribution. He admitted that he had been in jail before and had received probation. The defendant maintained that he was innocent of the charges of which he had been convicted and said that he was "sorry that [Bryan and Jamison Oldham] got shot, but [he] didn't do it."

Following the hearing, the trial court found that the defendant had a history of prior convictions for criminal behavior. Specifically, convictions for theft, assault, and criminal impersonation. The trial court found no mitigating factors. The trial court sentenced the defendant as a standard offender to a mid-range sentence of ten years on Count 1, attempted second-degree murder; two years on Count 2, reckless aggravated assault; three years on Count 3, aggravated assault; eleven months and twenty-nine days on Count 4, reckless endangerment; and one year on Count 5, reckless endangerment with a deadly weapon. The trial court ordered that Counts 1, 3, and 5 be served concurrently, and Counts 2 and 4 be served concurrently with each other but consecutive to Count 1.

The trial court found that the defendant was not a suitable candidate for probation or alternative sentencing, noting that incarceration was necessary to protect society. The court also found that consecutive sentencing was appropriate because the defendant's

> behavior indicated little or no regard for human life, and that the risk to human life was very high under the circumstances.
>
> . . . [and] consecutive sentences are reasonably related to the severity of the offenses committed, that it serves to protect the public from further criminal acts by someone who has resorted to aggravated criminal conduct, and congruent with the principles of sentencing.

This court's review of a challenged sentence is a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

In conducting our de novo review of a sentence, this court must consider (a) the evidence adduced at trial and the sentence hearing; (b) the pre-sentence report; (c) the principles of sentencing; (d) the arguments of counsel as to sentencing alternatives; (e) the nature and characteristics of the offense; (f) the enhancement and mitigating factors; and (g) the defendant's potential or lack of potential for rehabilitation or treatment. *Id.* §§ 40-35-103(5), -210(b); *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

## 1. Enhanced Sentence

The defendant asserts that the trial court's adjustment of his sentence above the minimum in the range was not appropriate based on his prior record alone and that the court erred in not finding any mitigating factors. He points out that the sentence must be reasonably related to the severity of the offenses, and his "convictions . . . were based on questionable identification and were at most an assault and not an attempt to murder."

As a Range I offender convicted of a Class B felony, the defendant was subject to a potential sentence of eight to twelve years on the attempted second-degree murder conviction with the presumed sentence being eight years. *Id.* § 40-35-112(a)(2), -210(c). However, this sentence could be enhanced or reduced based upon the existence of applicable enhancement or mitigating factors. *Id.* § 40-35-210(d), (e) (2003). The weight given to each enhancement or mitigating factor was left to the discretion of the trial court based upon the record before it. *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

After reviewing the record, we conclude that the trial court did not err in enhancing the defendant's sentence two years above the minimum based on the defendant's prior criminal record. *See* Tenn. Code Ann. § 40-35-114(2).[4] The pre-sentence report indicates that despite his young age the defendant has accrued six convictions, albeit primarily misdemeanor, since turning eighteen. We note that misdemeanor convictions alone may support enhancement of a sentence based on prior

---

[4] Although the numbering has since changed, we are utilizing the numbering of the enhancement factors in place at the time the defendant committed the offenses.

criminal record. *See State v. Ramsey*, 903 S.W.2d 709, 714 (Tenn. Crim. App. 1995); *see also State v. Jackie J. Porter*, No. W2004-02012-CCA-R3-CD, 2005 WL 2860255, at *3 (Tenn. Crim. App., at Jackson, Oct. 31, 2005) (no Tenn. R. App. P. 11 application filed) (upholding the enhancement of the defendant's sentence based on prior criminal record due to the defendant's two prior misdemeanor convictions, one for theft of property under $500.00 and one for simple possession of marijuana). We also note that the trial court could have enhanced the defendant's sentence based on his use of a firearm during the commission of the offense. Tenn. Code Ann. § 40-35-114(10).

Moreover, the defendant is not entitled to relief based on his claim that the trial court erred in not finding any applicable mitigating factors. We note that the defendant did not elaborate on what factors the trial court should have found in mitigation. The defendant's allegation that the offense was "at most an assault" certainly does not serve as a mitigating factor. In fact, such allegation tends to show a lackadaisical attitude about the seriousness of these offenses. Moreover, our review has revealed no mitigation evidence that would be entitled to more than little weight. Accordingly, we discern no error.

## 2. Consecutive Sentence

The defendant lastly asserts that the trial court erred by ordering that some of his sentences run consecutively. We note, when a defendant is convicted of more than one criminal offense, the trial court may order the sentences to run concurrently or consecutively as guided by Tennessee Code Annotated section 40-35-115. Pursuant to this code section, a trial court may order consecutive sentencing if any of the following criteria are found by a preponderance of the evidence:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Id. § 40-35-115(b). If the trial court finds that the defendant is a "dangerous offender," it must also determine whether the consecutive sentences are reasonably related to the severity of the offenses and serve to protect the public from further criminal conduct by the offender. *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995).

Here, the trial court did indeed find that the defendant's behavior indicated little or no regard for human life where the risk to human life was high, *see* Tenn. Code Ann. § 40-35-115(b)(4), and made the findings required by *Wilkerson*. The record supports the trial court's determination. The defendant fired multiple shots into a crowded parking lot in an attempt to kill one or both of the victims, and the victims both suffered physical impairments and limitations due to the defendant's actions. Considering the defendant's cavalier attitude toward life and death, consecutive sentencing serves to protect the public from this defendant who continues to maintain that he was not responsible for the shootings and even if he were, the offenses "were at best assaults and not an attempt to murder anyone." We discern no error in the trial court's ordering consecutive sentencing.[5]

### III. CONCLUSION

Upon our review of the record and the parties' briefs, we modify the judgments of the trial court to show the merger of the defendant's conviction in Count 3 into Count 1 and merger of Count 4 into Count 2. Due to the merger, only Count 2 will run consecutively with Count 1; however, the defendant's effective sentence of twelve years remains the same. We affirm the trial court's judgments in all other respects.

_____

J.C. McLIN, JUDGE

---

[5] Due to our conclusion above that the defendant's conviction in Count 4 be merged into Count 2 and Count 3 be merged into Count 1, only Count 2 will run consecutively to Count 1. Nonetheless, the defendant's effective sentence of twelve years remains unchanged – two years on Count 2 which will run consecutively to ten years on Count 1.